## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
## SAN ANGELO DIVISION

| | | |
|---|---|---|
| KAREN D.,[1] | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | No. 6:18-CV-0001-BL |
| | § | |
| NANCY A. BERRYHILL, | § | |
| Acting Commissioner of Social Security, | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM OPINION AND ORDER

Pursuant to 42 U. S. C. § 405(g), Plaintiff seeks judicial review of a decision of the Commissioner of Social Security ("Commissioner") denying her application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act and Supplemental Security Income ("SSI") under Title XVI of the Act.[2] *See* Compl. (doc. 1) (seeking judicial review but not specifying the particular provisions). The Commissioner has filed an amended answer, *see* Def.'s Am. Answer (doc. 14), and a certified copy of the transcript of the administrative proceedings, *see* SSA Admin. R. [hereinafter "R."] (doc. 16), including two hearings before an administrative law judge ("ALJ"). The parties have briefed the issues. *See* Pl.'s Mem. (doc. 20); Def.'s Mot. Summ. J. and Resp. Br. (doc. 21) [hereinafter Resp.];[3] Pl.'s Reply Br. (doc. 22). The United States District Judge reassigned

---

[1]To protect privacy concerns of plaintiffs in social security cases, the undersigned identifies the Plaintiff only by first name and last initial.

[2]Title II governs disability insurance benefits, *see* 42 U.S.C. §§ 401-34, and Title XVI governs supplemental security income for the aged, blind, and disabled, *see id.* §§ 1381-1383. Final determinations under Title XVI are subject to the same judicial review as provided in § 405(g). *See* 42 U.S.C. § 1383(c)(3). The Court will often refer to Plaintiff as Claimant, a designation used in social security cases.

[3]Although the Commissioner titles the filing as a motion for summary judgment and response brief, the Order Directing Filing of Briefs (doc. 19) explained that the Court would treat this case as appellate in nature and not proceed on cross-motions for summary judgment. Accordingly, the Court considers the filing as a response brief, not a motion for summary judgment.

the case to the undersigned subject to the consent of the parties. *See* Order (doc. 6). Because the parties have consented to proceed before a Magistrate Judge, the undersigned has full authority under 28 U.S.C. § 636(c) to consider this appeal, including issuing a final judgment. *See* Consents to Proceed Before a United States Magistrate Judge (doc. 17). After considering the pleadings, briefs, administrative record, and applicable law, the Court reverses the Commissioner's decision with respect to denying SSI benefits and remands this case for further administrative proceedings consistent with this order.

## I. BACKGROUND

Plaintiff was born June 18, 1962. R. 170, 349, 351. She initially claimed disability due to a back injury, fibromyalgia, arthritis, diabetes, and high blood pressure. R. 150. She filed an application for DIB on July 6, 2012,[4] and for SSI on July 26, 2012, alleging disability beginning December 31, 2005. R. 349, 351. She filed name change amendments to both applications in November 2012. R. 357, 359. She withdrew her Title II application for DIB at her July 28, 2016 hearing before the ALJ when she amended her onset date to May 7, 2012, and the ALJ pointed out that her date of last insured for Title II benefits expired on December 31, 2010. R. 68, 99-101. Because SSI is unavailable prior to the filing of an application, *see* 20 C.F.R. § 416.335, the most relevant time period for her pending SSI application and the Court's review commenced in July 2012. The relevant disability period for an SSI claim is the application date through the date of the ALJ's decision. *Chiles v. Colvin*, No. 3:12-CV-3516-L-BH, 2014 WL 630888, at *9 (N.D. Tex. Feb. 18, 2014) (accepting recommendation of Mag. J.). Nevertheless, medical records from before that date may be relevant

---

[4]The application has a July 26, 2012 date at the top but mentions that the application was completed on July 6, 2012. *See* R. 349.

to the extent they provide information relative to whether she was disabled on or after the date of the application.

On December 3, 2013, ALJ Ward D. King held a hearing on Plaintiff's applications. R. 127-49. Although he denied benefits on March 25, 2014, R. 201-12, the Appeals Council vacated that denial and remanded the decision for further consideration on July 29, 2015, R. 218-19. Following a second hearing held July 28, 2016, *see* R. 96-126, the ALJ issued another unfavorable decision on February 9, 2017, finding that Plaintiff was not disabled and was capable of performing work that exists in significant numbers in the national economy, R. 67-90.

Because Plaintiff withdrew her application for Title II benefits and was ineligible for such benefits based upon her May 7, 2012 alleged onset of disability, the ALJ dismissed that application and thereafter addressed only the claim for SSI benefits. R. 68. Accordingly, the ALJ cited only to the SSI regulations. *See id.* Applying the sequential, five-step analysis set out in the regulations (20 C.F.R. § 416.920(a)(4)) the ALJ first determined that Plaintiff had not engaged in substantial gainful activity since the amended alleged onset date. R. 69. The ALJ next determined that Plaintiff had the following severe impairments: (1) degenerative disc disease of the lumbar spine, status post-surgery; (2) degenerative changes of right hip; (3) osteoarthritis; (4) obesity; (5) fibromyalgia; (6) diabetes; (7) peripheral neuropathy; (8) hypertension; and (9) iron-deficiency anemia. R. 69-70. The ALJ also noted diagnoses of unspecified depressive and anxiety disorders, but found them not severe. R. 70-74. Third, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or equaled the severity of any impairment in the listings.[5] R. 74-76.

---

[5] Section 416.925 explains the purpose and use of the listings of impairments.

The ALJ then determined that Plaintiff retained the residual functional capacity ("RFC")[6] to "lift, carry, push, or pull 20 pounds occasionally and 10 pounds frequently; sit throughout an 8-hour workday; stand or walk (individually or in combination) 4 hours in an 8-hour workday; and otherwise perform the full range of light work, except" that she is unable to "climb ladders, scaffolds, or ropes; she can only occasionally stoop, kneel, crouch, crawl, or climb ramps or stairs; and she can frequently balance."[7] R. 76. Based upon the RFC determination and testimony from a vocational expert ("VE"), the ALJ concluded that Plaintiff could not perform her past relevant work, but could perform jobs that exist in significant numbers in the national economy. R. 88-89. At Step 5 of the evaluative sequence, the ALJ thus found that Plaintiff was not disabled within the meaning of the Social Security Act at any relevant time through the date of his decision. R. 89.

On November 7, 2017, the Appeals Council ("AC") found no reason to review the ALJ decision and thus denied Plaintiff's request for review. R. 1. Although Plaintiff submitted additional medical records from Shannon Medical Center from May 25, 2016, through January 25, 2017, the AC found that "this evidence does not show there is a reasonable probability that it would change

---

[6]Section 416.945(a)(1) explains that a claimant's RFC "is the most [he or she] can still do despite [his or her] limitations." When a case proceeds before an ALJ, it is the ALJ's sole responsibility to assess the claimant's RFC. 20 C.F.R. § 416.946(c). However, that assessment must be "based on all of the relevant medical and other evidence" of record. *Id.* § 416.945(a)(3).

[7]The regulations address physical exertion requirements and explain:

> Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, [the claimant] must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R. § 416.967(a).

the outcome of the decision." R. 2. The AC thus "did not consider and exhibit this evidence." *Id.*

The ALJ's decision is the Commissioner's final decision and is properly before the Court for review.

*See Higginbotham v. Barnhart*, 405 F.3d 332, 334 (5th Cir. 2005) (stating that the Commissioner's

final decision "includes the Appeals Council's denial of [a claimant's] request for review").

Plaintiff commenced this social security appeal on January 10, 2018. *See* Compl. She lists

two issues, including a failure of the ALJ to properly consider opinions of her treating physician,

Caleb Vosburg, M.D. *See* Pl.'s Mem. at 1-19.

## II. PRELIMINARY MATTER

Plaintiff commenced this action to seek review of the Commissioner's decision to deny her

DIB and SSI. *See* Compl. at 1. By amending her alleged onset date to a date after her date last

insured, Plaintiff effectively withdrew her application for DIB. Noting that withdrawal, the ALJ

dismissed that application and proceeded to address only the claim for SSI benefits. Plaintiff raises

no issue relating to the dismissal of her Title II claim for DIB. Accordingly, to the extent that she

seeks review of that decision, the Court affirms the decision of the Commissioner as it relates to any

claim for benefits under Title II. The only issues before the Court relate to Plaintiff's claim for SSI

under Title XVI.

## III. LEGAL STANDARD

In general,[8] a person is disabled within the meaning of the Social Security Act, when he or

she is unable "to engage in any substantial gainful activity by reason of any medically determinable

physical or mental impairment which can be expected to result in death or which has lasted or can

---

[8]The Act provides an alternate definition of disability for individuals under the age of eighteen. *See* 42 U.S.C.
§ 1382c(a)(3)(C). This provision is inapplicable on the current facts.

be expected to last for a continuous period of not less than twelve months." 42 U.S.C. §

1382c(a)(3)(A). "'Substantial gainful activity' is work activity involving significant physical or

mental abilities for pay or profit." *Masterson v. Barnhart*, 309 F.3d 267, 271 n.2 (5th Cir. 2002)

(citing 20 C.F.R. § 404.1572(a)-(b)); *accord* 20 C.F.R. § 416.972(a)-(b). To evaluate a disability

claim, the Commissioner employs the previously mentioned

> five-step sequential analysis to determine whether (1) the claimant is presently work-
> ing; (2) the claimant has a severe impairment; (3) the impairment meets or equals an
> impairment listed in appendix 1 of the social security regulations; (4) the impairment
> prevents the claimant from doing past relevant work; and (5) the impairment prevents
> the claimant from doing any other substantial gainful activity.

*Audler v. Astrue*, 501 F.3d 446, 447-48 (5th Cir. 2007). If, at any step, the Commissioner determines

that the claimant is or is "not disabled, the inquiry is terminated." *Id.* at 448. The Commissioner

must assess the claimant's RFC before proceeding to Steps 4 and 5. *Perez v. Barnhart*, 415 F.3d

457, 461 (5th Cir. 2005). For Steps 1 through 4, the claimant has the burden to show disability, but

the Commissioner has the burden at Step 5 to "show that there is other substantial work in the

national economy that the claimant can perform." *Audler*, 501 F.3d at 448. If the Commissioner

carries that Step 5 burden, "the burden shifts back to the claimant to rebut th[e] finding" that he or

she can perform other work that is available in the national economy. *Newton v. Apfel*, 209 F.3d

448, 453 (5th Cir. 2000).

"Judicial review of the Commissioner's decision to deny benefits is limited to determining

whether that decision is supported by substantial evidence and whether the proper legal standards

are applied." *Sun v. Colvin*, 793 F.3d 502, 508 (5th Cir. 2015) (quoting *Boyd v. Apfel*, 239 F.3d 698,

704 (5th Cir. 2001)). "Substantial evidence is 'such relevant evidence as a reasonable mind might

accept to support a conclusion' and constitutes 'more than a mere scintilla' but 'less than a prepond-

erance' of evidence." *Hardman v. Colvin*, 820 F.3d 142, 147 (5th Cir. 2016) (quoting *Newton*, 209

F.3d at 452). "In applying the substantial evidence standard, the court scrutinizes the record to deter-

mine whether such evidence is present, but may not reweigh the evidence or substitute its judgment

for the Commissioner's." *Perez*, 415 F.3d at 461. The courts neither "try the questions *de novo*"

nor substitute their "judgment for the Commissioner's, even if [they] believe the evidence weighs

against the Commissioner's decision." *Masterson*, 309 F.3d at 272. The Commissioner resolves

conflicts of evidence. *Sun*, 793 F.3d at 508.

## IV. ANALYSIS

This appeal raises the following issues: (1) whether the ALJ improperly considered the opin-

ion of her treating physician, Dr. Vosburg, and instead relied on a stale opinion of a non-examining

physician in calculating her RFC and (2) whether substantial evidence supports the Step 5 denial of

benefits when the ALJ failed to acknowledge her borderline age category, and relied on testimony

from a VE elicited through an incomplete hypothetical question. *See* Pl.'s Mem. at 1-19.

Because Claimant does not place her mental condition at issue, there is no need to recite evi-

dence of record about mental conditions. To the extent warranted, the Court will cite to evidence

regarding her physical impairments. The Court has considered the entirety of the evidence of record

whether cited herein or not.

## A. Physical RFC Determination and Weight Given to Medical Evidence

Claimant contends that, when determining her RFC, the ALJ failed to properly consider opin-

ions of her treating physician, Dr. Vosburg, and relied on a stale opinion of a non-examining physi-

cian.

When considering whether a claimant is disabled, the Commissioner considers the medical

evidence available, including medical opinions.[9] *See* 20 C.F.R. § 416.927(b) (effective Aug. 24, 2012, to Mar. 26, 2017). Medical opinions may come from treating sources (for example primary care physicians), non-treating sources (physicians who perform a single examination of the claimant), or non-examining sources (a physician who reviews only the claimant's medical record). *See generally* 20 C.F.R. § 416.902 (effective June 13, 2011, to Mar. 26, 2017). The Fifth Circuit has "long held that ordinarily the opinions, diagnoses, and medical evidence of a treating physician who is familiar with the claimant's injuries, treatments, and responses should be accorded considerable weight in determining disability." *Greenspan v. Shalala*, 38 F.3d 232, 237 (5th Cir. 1994) (quoting *Scott v. Heckler*, 770 F.2d 482, 485 (5th Cir. 1985)). Nevertheless, even opinions from a treating source are "far from conclusive," because ALJs have "the sole responsibility for determining the claimant's disability status." *Id.*; *accord Paul v. Shalala*, 29 F.3d 208, 211 (5th Cir. 1994).

"After identifying relevant medical opinions of treating physicians, ALJs must determine whether any such opinion is entitled to controlling weight." *Bentley v. Colvin*, No. 3:13-CV-4238-P, 2015 WL 5836029, at *7 (N.D. Tex. Sept. 30, 2015) (citing 20 C.F.R. § 416.927(c)(2) and its Title II counterpart, § 404.1527(c)(2)). When identifying and considering relevant opinions, ALJs "must remember" that some medical records, such as medical source statements provided by a treating source, "may actually comprise separate medical opinions regarding diverse physical and mental

---

[9]As explained to claimants: "Medical opinions are statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions." 20 C.F.R. § 416.927(a)(2) (effective Aug. 24, 2012, to Mar. 26, 2017). The regulations, however, reserve some issues to the Commissioner "because they are administrative findings that are dispositive of a case" – opinions on such issues do not constitute medical opinions under the regulation. *Id.* § 416.927(d). Effective March 27, 2017, § 416.927 sets out a two-tiered approach for applying the regulation: "For claims filed (see § 416.325) before March 27, 2017, the rules in this section apply. For claims filed on or after March 27, 2017, the rules in § 416.920c apply." Regardless, the pertinent version for this appeal remains the one in effect when the ALJ issued his decision. *See Young v. Berryhill*, 689 F. App'x 819, 821 n.3 (5th Cir. 2017) (per curiam).

8

functions, such as walking, lifting, seeing, and remembering instructions, and that it may be necessary to decide whether to adopt or not adopt each one." Titles II & XVI: Med. Source Ops. on Issues Reserved to the Comm'r, SSR 96-5P, 1996 WL 374183, at *4 (S.S.A. July 2, 1996).

The regulations provide a six-factor detailed analysis to follow unless the ALJ gives "a treating source's opinion controlling weight." 20 C.F.R. § 416.927(c)(1)-(6) (effective Aug. 24, 2012, to Mar. 26, 2017).[10] "When a treating source has given an opinion on the nature and severity of a patient's impairment, such opinion is entitled to controlling weight if it is (1) 'well-supported by medically acceptable clinical and laboratory diagnostic techniques' and (2) 'not inconsistent with' other substantial evidence." *Wilder v. Colvin*, No. 3:13-CV-3014-P, 2014 WL 2931884, at *3 (N.D. Tex. June 30, 2014) (quoting *Newton v. Apfel*, 209 F.3d 448, 455 (5th Cir. 2000)); *accord* 20 C.F.R. § 416.927(c)(2) (effective Aug. 24, 2012, to Mar. 26, 2017). Furthermore, "absent reliable medical evidence from a treating or examining physician controverting the claimant's treating specialist, an ALJ may reject the opinion of the treating physician *only* if the ALJ performs a detailed analysis of the treating physician's views under the criteria set forth in [the regulations]." *Newton*, 209 F.3d at 453.

In addition, "the ALJ may re-contact a treating physician or other medical source if there is insufficient evidence to determine whether the claimant is disabled." *Perry v. Colvin*, No. 3:13-CV-2252-P, 2015 WL 5458925, at *7 (N.D. Tex. Sept. 17, 2015); *accord Jones v. Colvin*, No. 4:13-CV-

---

[10]These factors are: (1) the examining relationship; (2) the treatment relationship, including the length of time the physician has treated the claimant, the frequency of examination by the physician, and the nature and extent of treatment relationship; (3) support for the physician's opinions in the medical evidence of record; (4) consistency of the opinions with the record as a whole; (5) the specialization of the treating physician; and (6) any others factors brought to the ALJ's attention. 20 C.F.R. § 416.927(c) (effective Aug. 24, 2012, to Mar. 26, 2017). Even with the recent regulatory amendments, these factors remain relevant for claims filed before March 27, 2017. *See* 20 C.F.R. § 416.927(c) (effective Mar. 27, 2017). For claims filed on or after March 27, 2017, 20 C.F.R. § 416.920c provides details on how the administration considers and articulates medical opinions and prior administrative medical findings.

818-A, 2015 WL 631670, at *7 (N.D. Tex. Feb. 13, 2015) (accepting recommendation of Mag. J. which recognized that, effective March 26, 2012, this new regulation replaced the former mandatory requirement of § 404.1512(e) applied in *Newton*); 20 C.F.R. § 416.920b(c)(1). Further, "if after weighing the evidence [the ALJ] cannot reach a conclusion about whether [the claimant is] disabled," § 416.920b(c) provides "various options, including re-contacting a treating physician or other medical source, to resolve an inconsistency or insufficiency of evidence." *Bentley*, 2015 WL 5836029, at *8 (citing 20 C.F.R. §§ 404.1520b(c), 416.920b(c) (effective Mar. 26, 2012 to Mar. 26, 2017)).

ALJs who find a treating source opinion not entitled to controlling weight must consider the six regulatory factors to properly assess the weight to give such opinions. *Newton*, 209 F.3d at 456. However, "*Newton* requires only that the ALJ 'consider' each of the [regulatory] factors and articulate good reasons for its decision to accept or reject the treating physician's opinion. The [ALJ] need not *recite* each factor as a litany in every case." *Jeffcoat v. Astrue*, No. 4:08-CV-672-A, 2010 WL 1685825, at *3 (N.D. Tex. April 23, 2010) (emphasis added); *accord Emery v. Astrue*, No. 7:07-CV-084-BD, 2008 WL 4279388, at *5 (N.D. Tex. Sept. 17, 2008); *Burk v. Astrue*, No. 3:07-CV-899-B, 2008 WL 4899232, at *4 (N.D. Tex. Nov. 12, 2008) (accepting recommendation of Mag. J.). *Newton*, furthermore, does not require the detailed analysis when "there is competing first-hand medical evidence and the ALJ finds as a factual matter that one doctor's opinion is more well-founded than another." 209 F.3d at 458. Likewise, the detailed analysis under *Newton* is not necessary when the ALJ has weighed the treating physician's opinion against opinions of other treating or examining physicians who "have specific medical bases for a contrary opinion." *Id.*

The ALJ, as fact-finder, "has the sole responsibility for weighing evidence and may choose

whichever physician's diagnosis is most supported by the record." *Muse v. Sullivan*, 925 F.2d 785, 790 (5th Cir. 1991). ALJs have considerable discretion in assigning weight to medical opinions and may reject the opinion of a physician when the evidence supports a contrary conclusion. *Newton*, 209 F.3d at 455-56. Additionally, for good cause shown, an ALJ may assign little or no weight to an opinion from a treating source. *Id.* "Good cause may permit an ALJ to discount the weight of a treating physician relative to other experts where the treating physician's evidence is conclusory, is unsupported by medically acceptable clinical, laboratory, or diagnostic techniques, or is otherwise unsupported by the evidence." *Id.* at 456.

Claimant amended her alleged onset of disability to May 7, 2012, because that is when she started to have "more significant problems with her back." R. 99-100. On that date, she visited a Laser Spine Institute in Oklahoma with complaints of chronic low back pain that had been ongoing for three years without an inciting injury. *See* R. 506-16. In preparing for back surgery, she obtained X-rays and an MRI of her lumbar spine and X-rays of her pelvis. *See* R. 502-05.

The MRI revealed "a minimal broad-based disc bulge asymmetric towards the left resulting in mild left foraminal encroachment" at L3-4 and "[m]ild bilateral facet hypertrophic and degenerative changes" at L4-5 and L5-S1, "with fluid in the left facet joints" at L4-5. R. 502. At that time, the medical impression was (1) "Mild early disc degenerative changes . . . at L3-4 and L5-S1 with facet arthropathy most prominent at L4-5 and to a lesser degree L5-S1" and (2) "Mild lateral disc bulging toward the left at L3-4 result[ing] in mild foraminal encroachment." *Id.* The impression from the pelvic X-ray was "[o]steophytic degenerative change along the articular margins of the hip joints." R. 504. The lumbar X-ray revealed well-aligned vertebra and "narrowing of the L3-L4, L4-L5, and L5-S1 discs." R. 505.

From the MRI, Gary Casper, M.D., diagnosed and found degenerative disc disease at L3-4, L4-5, and L5-S1; foraminal stenosis at L3-4 and L4-5; facet degeneration/hypertrophy at L4-5 and L5-S1; and a bulging disc at L3-4. R. 515. The X-rays supported finding degenerative disc disease and facet degeneration/hypertrophy across all those spinal areas and compression fractures at L3-4. *See id.* He recommended back surgery. R. 515-16.

On May 8, 2012, Kit McCalla, D.O., performed the recommended surgery. *See* R. 517, 526. The surgeon performed two procedures: (1) "Destruction by Thermal Ablation of the Paravertebral Facet Joint Nerves, Left L3/4, Left L5/S1, Right L3/4, Right L5/S1 and Left L4/5" and (2) "Lumbar Laminotomy and Foraminotomy Including Partial Facetectomy with Decompression of the Nerve Roots, Right L4/5." R. 524. Two days later, Claimant reported "feeling much better." R. 517. At that point, she reported total resolution of radicular, numbness/tingling, and burning. R. 518. As of May 31, 2012, she was "still having some pain" but was "getting better." R. 519.

As of July 3, 2012, Claimant was "still in pain" and discussed decreased activity with medical personnel. R. 520. Two weeks later, she reported feeling "better since the surgery," but stated "something is still very wrong back there." R. 521. She said: "This isn't a nerve feeling its more like my bones are out of place." *Id.*

The next month, Claimant reported feeling a "shift" in her lower back resulting in her pain becoming "constant 'dull, grinding, aching.'" R. 522. She also reported that her right leg would "lock up" and her pain would sometimes make her unable to move. *Id.* Dr. McCalla and Claimant's primary care physician both ordered an MRI. *Id.* Kenneth E. Breedlove, M.D., of Shannon West Texas Memorial Hospital conducted an MRI of her lumbar spine on August 15, 2012, revealing disc desiccation, loss of disc height, "minimal retrolisthesis of L3 on L4 with moderate facet disease,"

12

and bilateral foraminal encroachment at L3-4. R. 529. With respect to L4-5, the MRI revealed slightly more disc desiccation and loss of disc height than comparison MRI from February 2011. *Id.* From the MRI, Dr. Breedlove opined that Claimant had mild multi-level degenerative disc disease and "facet disease with probably postoperative changes at L4-L5." *Id.*

O. Martin Franklin, D.O., conducted a consultative examination of Claimant on October 5, 2012. R. 532-35. At that time, Claimant reported five chief complaints: (1) back injury, (2) diabetes, (3) fibromyalgia, (4) arthritis, and (5) hypertension. R. 532. Dr. Franklin noted "fibromyalgia diagnosed in 2009," associated with chronic pain. *Id.* He also noted that, despite the surgical intervention in June 2012, Claimant relied on pain medication to help with her pain and she had "continued radicular pain to the right L4-5 that is sharp and achy." *Id.* Her diabetes was diet-controlled, but her hypertension was uncontrolled even with medication and was associated with her pain. *Id.* Claimant reported that "[o]verall she is staying the same to getting worse" and that she "can stand or sit doing a job one to two hours at a time depending on her back pain and fibromyalgia symptoms." *Id.*

Examination by Dr. Franklin revealed high blood pressure, morbid obesity, "multiple trigger points consistent with fibromyalgia in the torso and extremities," back spasms "with radicular pain to the right side at L4-5," an inability to "heel-to-toe walk on the right side," an inability to "squat and rise" unless holding a table or other stabilizing prop, "chronic venous insufficiency" of the extremities with ankle swelling, and "an antalgic gait with a right limp and normal base." R. 533-34. Although Claimant did "not use a cane" she would "benefit significantly with one." R. 534. Dr. Franklin also noted that Claimant's "hip locks frequently and her pain is so severe it causes her to vomit." *Id.* Straight leg raise testing was "80 degrees on the left and 65 degrees on the right secon-

dary to pain." *Id.* While she had full cervical and thoracic ranges of motion, her lumbar range of motion was "30 degrees flexion, 0 degrees extension." *Id.* Based upon his physical examination, Dr. Franklin diagnosed five conditions: (1) "Degenerative disc disease with osteoarthritis, thoracolumbar spine"; (2) diabetes controlled by diet; (3) fibromyalgia; (4) hypertension; and (5) morbid obesity. *Id.*

On October 23, 2012, Randal Reid, M.D., assessed Claimant's physical RFC to set out the extent her impairments impacted her ability to work at that time. R. 155-56, 164-65. In pertinent part, Dr. Reid stated that Claimant could (1) lift/carry twenty pounds occasionally, ten pounds frequently; (2) stand and/or walk for six hours in an eight-hour workday with normal breaks, and (3) sit for six hours in an eight-hour workday with normal breaks. R. 155, 164. Dr. Reid also gave postural limitations, including only occasional stooping and climbing ramps or stairs. *Id.* He found her postural limitations would preclude climbing ladders, ropes, or scaffolds. *Id.* He found no other limitation and stated that her "[a]lleged limitations are partially supported by EOR [(evidence of record)]." R. 156, 165. He opined that Claimant had the RFC to perform her past relevant work as a server. R. 157, 166.

On April 2, 2013, Betty Santiago, M.D., assessed Claimant's physical RFC for the period of December 1, 2011, through the date of her assessment. R. 179-80. Her assessment of exertional limitations differed from that of Dr. Reid only in that she stated that Claimant could stand/or walk for four hours in an eight-hour workday with normal breaks. *Compare* R. 155, 164 *with* R. 179. Dr. Santiago's assessment of postural limitations also differed in that she found Claimant capable of climbing ladders, ropes, and scaffolds occasionally, but was also limited to occasional crouching and crawling in addition to stooping. *Compare* R. 155, 164 *with* R. 179.

In June, July, and August 2013, Claimant visited Community Medical Associates, including her primary care physician, Brett Nile, M.D. *See* R. 560-62 (June 3, 2013); 575-77 (July 17, 2013); 578-81 (August 5, 2013). A blood pressure check and a need for disability paperwork prompted the June visit. R. 560. Among her active problems were anemia, hypertension, osteoarthrosis, and diabetes. *See* R. 560-61. She was assessed with hypertension and hyperlipidemia, which led to a medication plan for her hypertension. R. 562. Medical personnel informed Claimant that she would need to go elsewhere for a disability physical. *Id.*

The July visit was a follow-up to a July 14, 2013 visit to the emergency room ("ER") at San Angelo Community Medical Center. *See* R. 563-73, 575. Claimant presented multiple complaints but primarily complained of numbness and tingling for the past month. R. 563. Medical personnel noted pain in five areas, generalized aches and weakness, facial numbness, and dizziness. *Id.* Past medical history listed back problems and fibromyalgia. *Id.* The clinical impression was acute hyperglycemia. R. 564. The ER discharged Claimant on July 15, 2013, with instructions to follow up with Dr. Nile in one week. R. 570. Pertinent diagnoses on discharge included uncontrolled diabetes, chronic back pain, and hypertension. R. 571.

Two days after her ER discharge, Claimant returned to Dr. Nile where she reported feeling better from the condition that sent her to the ER but complained of lumbar and groin pain. R. 575. A review of her musculoskeletal system revealed joint stiffness and joint and back pain, but no joint swelling. *Id.* A neurological system review revealed numbness, tingling, and limb weakness. R. 576. Dr. Nile's assessment listed four conditions: (1) diabetes, (2) hypertension, (3) insomnia, and (4) anxiety. R. 577.

When Claimant returned to Dr. Nile for a two-week follow up on August 5, 2013, she was

provided contacts for reported vision changes. R. 578. A review of systems revealed back pain, but no dizziness. *Id.* Dr. Nile assessed diabetes, hypertension, and osteoarthrosis, all of which he planned to treat with medication. R. 579-80.

The administrative record lacks medical records from August 2013 through March 2015. A record of Shannon Clinic from early March 2015 shows MRIs for Claimant's lumbar and hip areas. R. 857. A right hip MRI was scheduled for March 23, 2015. R. 632. An MRI patient screening form states that Claimant had had right "hip pain since 2009" and had an X-ray of that area on February 25, 2015. R. 867. The MRI scan revealed "at least moderate degenerative changes in the RIGHT hip, including joint space narrowing and osteophyte formation." R. 632. Nothing indicated any "occult fracture or avascular necrosis," but there were "some very subtle edema type signal adjacent to the introchanteric consistent with some minimal tendinitis or developing bursitis." *Id.* After reviewing the scan, Michael Sickels, M.D., opined that (1) the right hip was experiencing moderate degenerative changes; (2) findings were "consistent with mild/early tendinitis vs bursitis at the level of the greater trochanter"; and (3) there were no "occult fracture, avascular necrosis, or joint effusion." *Id.*

Claimant visited Caleb Vosburg, M.D., for the first time on April 28, 2015. R. 874. On that date, he completed a Spinal Impairment Questionnaire in which he stated two diagnoses supported by X-rays of the pelvis and lumbar spine and a pelvic MRI: (1) osteoarthritis - bilateral hips and (2) lumbar radiculpathy. *Id.* He indicated that Claimant had "a neuro-anatomical distribution of pain," which was severe, sharp, constant, and located in the right groin. *Id.* He identified four clinical findings that demonstrate or support his diagnoses: (1) limited range of motion in right hip, (2) sensory loss in thigh, (3) positive sitting straight leg raise test at 20 degrees on the right, and (4) an antalgic

gait with stooped posture. R. 876.

Based on this examination, review of prior X-rays and an MRI, and considering Claimant's conditions, Dr. Vosburg estimated that Claimant would be able to sit for more than six hours in an eight-hour workday and would be able to stand or walk for less than one hour. R. 875. He found that it was not medically necessary for Claimant to "avoid continuous sitting in an 8-hour workday" or "elevate the legs while sitting." R. 876. He also opined that Claimant could frequently lift and carry up to twenty pounds, but her conditions would preclude walking "a block at a reasonable pace on rough or uneven surfaces." R. 877.

Although Dr. Vosburg found no need for a cane or assistive device while Claimant stands or walks, he did find use of single point cane medically recommended. *Id.* He found no significant limitations in Claimant's ability to reach, handle, or finger. R. 878. He also found that she would frequently experience pain, fatigue, or other symptoms severe enough to interfere with attention and concentration and would often "need to take unscheduled breaks at unpredictable intervals through-out an eight-hour workday." *Id.* He expected the diagnoses and limitations to last at least twelve months and, although he stated it was "hard to tell," he checked "No" to the question asking whether Claimant was a malingerer. *See id.* He also noted that Claimant's obesity would exacerbate her symptoms by increasing the strain on her back and hip. R. 879. He opined that, on average, she would likely be absent from work more than three times per month due to her impairments or treatments. *Id.* In his medical opinion, her symptoms and related limitations date back to December 1, 2009. *Id.*

The next month, Claimant began hip injection treatment with Dr. Vosburg. On May 5, 2015, Dr. Vosburg ordered a hip injection for pain in Claimant's right hip. R. 838. On May 13, 2015,

Shannon Medical Center admitted her for an outpatient hip injection. R. 631, 701, 836, 848-49. She underwent a similar injection for her left hip the next month. R. 629, 818-20, 829-30, 835. A radiology procedure form dated June 18, 2015, states that Claimant walked with a cane and was "tearful after procedure before getting off of table." R. 828.

On August 11, 2015, four months after his initial evaluation, Dr. Vosburg completed an eleven-question Medical Source Statement, in which he identified Claimant's impairments as "hip arthritis, lumbar radiculopathy, depression, fibromyalgia, [and] obesity." R. 627. He opined that, at that time, Claimant had unspecified limitations in sitting, standing, walking, stooping, and climbing. *Id.* He further opined that, although Claimant could frequently lift/carry ten pounds or less, she could never lift/carry eleven or more pounds in an average workday. *Id.* According to Dr. Vosburg, Claimant could continuously use her hands for fine or gross manipulation and raise her arms above the shoulders. *Id.* He noted that her condition caused severe pain, Claimant would need to elevate her legs, and she would need to take unscheduled breaks beyond the typical ones each work day. R. 628. He opined that Claimant could not be "reasonably expected to work an 8 hour day, 40 hour work week, on a regular basis, without missing more than 2 days a month due to [her] disabilities." R. 627.

Ross Harper, M.D., took an MRI of Claimant's lumbar spine on September 24, 2015, and compared it to a February 25, 2015 scan. R. 812. It showed "[m]ild disc desiccation . . . throughout the lumbar spine, without significant intervertebral disc space height loss." *Id.* There was also "mild multilevel spondylosis manifested by facet hypertrophy predominantly at the L3/4, L4/5, and L5/S1 vertebral levels." *Id.* At the L3/4 level, there was "[a]symmetric left foraminal disc bulge resulting in mild to moderate left neural foraminal stenosis," but "[n]o significant central spinal canal steno-

sis." *Id.* The L4/5 level showed "[b]ilateral facet/ligamentum flavum hypertrophy resulting in effacement of the thecal sac and moderate bilateral neural foraminal stenosis" and "postoperative changes of prior right laminotomy." *Id.* The L5/S1 level showed "[b]ilateral facet/ligamentum flavum hypertrophy resulting in effacement of the thecal sac without significant central spinal canal or neural foraminal stenosis" *Id.* Dr. Harper opined that Claimant had multilevel spondylosis. *Id.*

On October 15, 2015, Claimant complained of chest pain to Christopher A. Haddad, M.D., at the Shannon Clinic. R. 717-19. She described "a heavy type sensation" that "generally occurs with exertion and improves with resolution of exertion." R. 717. A review of her neurological system showed no numbness, tingling, gait abnormality, or focal weakness. R. 718. A review of her musculoskeletal system showed no joint pain. *Id.* Physical examination showed that she was not in any acute distress; she had "full range of motion" in her joints, with "no gross defects"; and her motor and sensory functioning were grossly intact. *Id.* Dr. Haddad assessed (1) chest pain with typical symptoms, (2) diabetes, (3) hypertension, and (4) mixed hyperlipidemia. R. 719. He noted that Claimant "presents with symptoms worrisome to [him] for progressive angina" because she has "multiple risk factors." *Id.* He concluded that "the most prudent course of evaluation would be coronary angiography" and noted that his "clinical suspicion is intermediate to high for obstructive disease." *Id.* He diagnosed angina and ordered a left heart catheterization. R. 721.

About two weeks later, Claimant underwent a cardiac catheterization that showed no obstructive coronary artery disease ("CAD"). R. 720, 741. At that point, the recommended course of action was to continue risk factor modification. *Id.* Her "heart failure status was assessed as NYHA Class II" and her "anginal syndrome was assessed as Class III according to the Canadian clinical classification." R. 742.

Medical records show that Dr. Vosburg continued to treat Claimant between November 2015 and May 2016. *See* R. 634 (May 25, 2016 right hip injection); 635 (May 11, 2016 outpatient order); 643 (May 25, 2016 injection); 652 (May 26, 2016 appointment); 655 (May 10, 2016 treatment); 684 (February 24, 2016 injection); 686 (February 18, 2016 admittance); 693 (November 11, 2015 hip injection); 696 (November 5, 2015 outpatient order); 705 (November 11, 2015 injection).

The ALJ specifically considered the two questionnaires completed by Dr. Vosburg and the opinions stated therein. *See* R. 85-86. The ALJ accorded "very little weight" to the opinions regarding Claimant's "ability to work, the severity of her impairments, and her limitations, because they were inconsistent with and not supported by the objective medical evidence, physical examination findings, and other reliable evidence." R. 86. After noting that Dr. Vosburg began treating Claimant "in May 2013"[11] and had examined her "only a few occasions since then," the ALJ found these factors weighed against the doctor's opinions. *Id.* The ALJ characterized the opinions regarding unscheduled breaks and absences from work as "pure speculation, not supported by any examination finding or clinical evidence." *Id.* The ALJ also recognized that treatment records "did not indicate circumstances necessitating that [Claimant] elevate her legs, as indicated in the August 2015 questionnaire; in the April 2015 questionnaire, he indicated [she] did not need to elevate her legs while sitting" and "[t]he evidence did not indicate any significant changes in her medical conditions, injury, or other factor in the interim to warrant such a restriction." R. 86-87.

As a treating source, the medical opinions of Dr. Vosburg are entitled to controlling weight if well-supported as required by the regulations and not inconsistent with other substantial evidence.

---

[11]This is an apparent typographical error. The evidence of record shows that Dr. Vosburg first saw Claimant in April 2015.

The ALJ did not accord the opinions controlling weight, but instead gave them "very little weight." R. 86. At this point, there is no need to determine whether the ALJ erred in not giving the opinions controlling weight because even if the Court were to find no error in that respect, such finding merely clears the first hurdle. Once the ALJ finds that a medical opinion of a treating source is not entitled to controlling weight, he or she must make the detailed analysis required by 20 C.F.R. § 416.927(c) unless there is reliable medical evidence from a treating or examining physician controverting the opinions of the treating source.

In this case, the ALJ cited § 416.927(c) and essentially recited the six factors. *See* R. 86. However, this recitation is within boilerplate language in a paragraph inserted between the ALJ's summary of the two Vosburg questionnaires and his discussion of the weight he would assign to Dr. Vosburg's opinions. Use of boilerplate language may be justified and warranted in various contexts, but in circumstances requiring consideration of specific factors, like required by § 416.927(c), the decision of the ALJ must reflect consideration of the factors – not merely listing them without proper connection to the facts of the case.

Here, while the discussion paragraph recognizes the examining and treatment relationships between Dr. Vosburg and Claimant, the ALJ does not detail the nature of the treatment relationship. More importantly, the ALJ does not address the support for Dr. Vosburg's opinions in the medical record, except to state in conclusory terms that the opinions are inconsistent with and unsupported by unspecified objective medical evidence, physical examination findings, and other reliable evidence. Nor does the ALJ otherwise discuss the consistency of the opinions with the record as a whole, except to point out a potential inconsistency between the two questionnaires regarding Claimant's need to elevate her legs. The ALJ also does not discuss whether Dr. Vosburg is a specialist

whose opinions may be entitled to greater weight, although he does note that Dr. Vosburg provided hip injections. *See* R. 85-86.

The Commissioner suggests that the ALJ considered Dr. Vosburg to be a specialist by noting that he gave Claimant hip injections. *See* Resp. at 8. While that notation may indicate a medical speciality, it does not constitute an adequate discussion of any speciality of Dr. Vosburg. Nevertheless, because Claimant does not suggest that Dr. Vosburg is a specialist, the failure to discuss that possibility provides little reason to question the consideration given to that factor. However, the same cannot be said about the absence of appropriate discussion on the other factors. While the ALJ cites to and recites the regulatory factors, his opinion as a whole does not reflect that he considered the factors as they specifically relate to the opinions of Dr. Vosburg in this case.

As part of the consideration given to the regulatory factors, *Newton* requires ALJs to articulate good reasons for rejecting or accepting an opinion of a treating physician. The ALJ in this case failed in that respect. Although he recognized Dr. Vosburg as an acceptable medical source who qualified as a treating source, he found that the limited length of that treatment relationship and the "few occasions" that he treated Claimant weighed against his opinions. R. 86. But that reasoning is inconsistent with the ALJ according "very significant weight to the opinions of the State agency physicians," Dr. Reid who evaluated Claimant's disability claim in October 2012 and Dr. Santiago who evaluated the claim in April 2013. *See* R. 83-84. These agency physicians both conducted a one-time evaluation of Claimant's impairments without examining her. It is incongruent to accord their opinions significant weight while finding that the length and frequency of Dr. Vosburg's ongoing treating relationship weigh against his medical opinions.

The ALJ next supported his decision to accord "very little weight" to the opinions of Dr.

Vosburg because he viewed them as inconsistent and unsupported by objective medical evidence, physical examination findings, and other reliable evidence. R. 86. Similarly, he dismissed the opinions regarding a need for breaks and absences from work as "pure speculation, not supported by any examination finding or clinical evidence." *Id.* First, while Dr. Vosburg initially identified only impairments related to Claimant's back and hip problems, his course of treatment led him to also specifically identify fibromyalgia and obesity as impairments. *Compare* R. 627-28 *with* R. 874-79.

> When a claimant has an accepted diagnosis, such as fibromyalgia, that often lacks objective clinical findings, an allegation of an absence of objective clinical findings does not alone constitute good cause to reject opinions of treating physicians. To show good cause under such circumstances, the ALJ's decision must do more than merely state that the opinions "are not supported by any objective clinical findings"
> . . ..

*Bragg v. Comm'r Soc. Sec. Admin.*, 567 F. Supp. 2d 893, 912 (N.D. Tex. 2008) (accepting recommendation of Mag. J.). Here, the ALJ attempts to rely on more than a lack of objective findings, but his attempt fails as discussed in the following paragraphs.

Although the ALJ provides a good summary of the medical record, *see* R. 81-87, he does not connect any medical record to his consideration of the opinions of Dr. Vosburg except to point out a perceived inconsistency between answers to the two questionnaires. The ALJ contends that "[t]he evidence does not indicate any significant change in her medical conditions, injury, or other factor that occurred" after the first questionnaire to warrant the additional restriction set out in the subsequent questionnaire that Claimant would need to elevate her legs. R. 86-87. Prior to setting out the opinions stated in the questionnaires, the ALJ noted hip injection treatment provided by Dr. Vosburg in May and June 2015, *see* R. 85, but he does not discuss how this additional treatment could result in Dr. Vosburg determining that Claimant must elevate her legs as set out in the August 2015

questionnaire. Nor does he recognize the additional diagnoses of Dr. Vosburg formed after his answers to the initial questionnaire. The ALJ appears to ignore these "other factors" that took place between the first and second questionnaires. He also appears to ignore Dr. Vosburg's reliance on X-rays and an MRI to diagnose osteoarthritis in the hips and lumbar radiculpathy as stated in the April 2015 questionnaire.

Rather than cite medical evidence that contradicts the opinions of Dr. Vosburg, it appears that the ALJ "impermissibly relied on h[is] own lay opinion, derived from h[is] interpretation of . . . examination records" to conclude that there was no support for finding a need for Claimant to elevate her legs and that Dr. Vosburg was merely speculating as to the number of absences and the need for breaks. *See Thompson v. Colvin*, No. 3:15-CV-2262-BN, 2016 WL 1555795, at *4 (N.D. Tex. Apr. 18, 2016). As the Fifth Circuit recognized more than fifteen years ago, ALJs "must be careful not to succumb to the temptation to play doctor" by making independent medical assessments from their own perspectives and intuitions. *Frank v. Barnhart*, 326 F.3d 618, 622 (5th Cir. 2003) (quoting *Schmidt v. Sullivan*, 914 F.2d 117, 118 (7th Cir. 1990)). By surmising that Dr. Vosburg was engaging in speculation rather than rendering an informed medical opinion, the ALJ himself engaged in impermissible speculation in the absence of medical evidence to the contrary.

Moreover, the ALJ points to no competing opinion of any examining physician as support for according minimal weight to Dr. Vosburg's opinions. Earlier in his decision, the ALJ specifically states that his RFC determination is supported by Dr. Franklin's "physical examination findings." R. 83. But, at no point, did Dr. Franklin make any opinion as to Claimant's ability to work, the severity of her impairments, or limitations resulting from her impairments. The ALJ does not discuss how the opinions from this one-time consultative examination are inconsistent with opinions

of Dr. Vosburg. Medical records or "notes that do not give an opinion on [a Claimant's] physical limitations in the workplace or what activities she would be able to perform do not controvert the opinion of [the Claimant's] treating physician," which specifically does so. *Anderson v. Colvin*, No. 3:15-CV-781-BN, 2016 WL 299019, at *6 (N.D. Tex. Jan. 25, 2016). Furthermore, the examination by Dr. Franklin provides direct support for various opinions of Dr. Vosburg, i.e., inability to heel-and-toe walk, squatting difficulties, multiple trigger points consistent with fibromyalgia. *See* R. 534.

The Commissioner points to the physical examination by Dr. Haddad on October 15, 2015, as a competing first hand opinion that contradicts the opinions of Dr. Vosburg. *See* Resp. at 9. First, although the ALJ summarized that examination, he did not rely on it as any basis for discounting the opinions of Dr. Vosburg. *See* R. 87. This is not a case where the ALJ found as a factual matter that Dr. Haddad's opinions were more well-founded than Dr. Vosburg. *See Newton v. Apfel*, 209 F.3d 448, 458 (5th Cir. 2000). Moreover, Dr. Haddad made no opinion regarding Claimant's physical limitations or what activities she may or may not be capable of performing. He states no opinion that is contrary to any medical opinion of Dr. Vosburg as to Claimant's limitations and abilities.

Additionally, Dr. Haddad examined Claimant secondary to complaints of chest pain. *See* R. 717. The examination was not related to any impairment that the ALJ found to be severe. *See* R. 69 (listing severe impairments and not including angina or any condition related to chest pain). While every examination of a social security applicant may shed light on various conditions, even those not specifically prompting the examination, the exception to conducting the detailed analysis under *Newton* and the regulations contemplates that the competing first-hand medical evidence contradict or otherwise provide good cause to reject the medical opinions of the treating source. The examination by Dr. Haddad does not contradict the specific limitations and physical abilities opined

by Dr. Vosburg. Nor does it otherwise provide good cause to discount those opinions.

The Court thus agrees that the ALJ failed to provide a legitimate basis for discounting or rejecting opinions of Dr. Vosburg. Deferring to a non-examining source over a treating source is not supported by substantial evidence "when a non-examining physician makes specific medical conclusions that either contradict or are unsupported by findings made by an examining physician. *Villa v. Sullivan*, 895 F.2d 1019, 1024 (5th Cir. 1990); *accord Brown v. Astrue*, 344 F. App'x 16, 20 (5th Cir. 2009) (per curiam) ("When a non-examining physician's conclusions either contradict or are unsupported by an examining physician's findings, the non-examining physician's report does not provide substantial evidence."). Accordingly, the ALJ's decision to discount the opinions of Dr. Vosburg is not substantially supported by the evidence. In such circumstances, the ALJ acts "without good cause" in rejecting those opinions and "it ultimately does not matter whether the ALJ considered the Section 416.927(c) factors." *Wilkerson v. Berryhill*, No. 3:16-CV-851-BN, 2017 WL 1091601, at *4 (N.D. Tex. Mar. 23, 2017).

Nevertheless, as already discussed, the ALJ did not properly consider the regulatory factors. Furthermore, on the record before the Court, the failure to conduct the detailed analysis is not harmless error. Dr. Vosburg provided the only reliable medical opinions of Claimant's physical abilities from a treating or examining source. Rather than properly weigh and consider those opinions in accordance with the regulation and *Newton*, the ALJ improperly discounted them as discussed above. In addition, he noted that opinions of Dr. Franklin support his RFC determination and gave great weight to opinions from non-examining physicians. However, Dr. Franklin stated no opinion regarding Claimant's physical abilities. *See* R. 532-35. Based on Dr. Vosburg's medical opinions regarding Claimant's ability to stand/walk, her need for unscheduled breaks, and the

estimated number of absences from work, Claimant did not possess the functional ability for light work as assessed by the ALJ.

In making his RFC assessment, the ALJ rejected specific medical opinions of Dr. Vosburg. Rejecting medical opinions when there is no contrary opinion from a treating or examining source requires usurping the physicians' role. *See Newton*, 209 F.3d at 453-58. "That is neither the role of the ALJ nor this Court. Neither the courts nor ALJs may rely on their own medical opinions as to the limitations presented by a claimant's impairments." *Howeth v. Colvin*, No. 3:12-CV-0979-P, 2014 WL 696471, at *11 (N.D. Tex. Feb. 24, 2014) (citing *Williams v. Astrue*, 355 F. App'x 828, 832 (5th Cir. 2009) (per curiam) (reversing denial of benefits when the ALJ impermissibly relied on his own medical opinions as to limitations presented by the claimant's impairments)). It is reversible error for ALJs to substitute their own medical opinions for those of a treating physician. *Evans v. Colvin*, No. 1:14-CV-202-BL, 2015 WL 9685552, at *3 (N.D. Tex. Dec. 8, 2015) (recommendation of Mag. J.), *adopted by* 2016 WL 112645 (N.D. Tex. Jan. 8, 2016).

Like *Newton*, "[t]his is not a case where there is competing first-hand medical evidence and the ALJ finds as a factual matter that one doctor's opinion is more well-founded than another." *See* 209 F.3d at 458. While the ALJ relied on medical opinions of state agency consultants, such opinions do not constitute first-hand medical evidence, because it appears that they were formed on a second-hand basis from a review of then existing medical records. Furthermore, the consultants' opinions were for a period ending no later than April 2013. The consultants lacked access to all of Dr. Vosburg's treatment records and opinions. They lacked access to the September 2015 MRI and other medical records post-dating their review of their record. Like *Newton*, this is not "a case where the ALJ weighs the treating physician's opinion on disability against the medical opinion of other

physicians who have treated or examined the claimant and have specific medical bases for a contrary opinion." *See id.* Instead, like *Newton*, the ALJ in this case rejected medical opinions of a treating physician without a contrary opinion by an examining or treating physician. *See id.* By doing so, the ALJ erred. Furthermore, to the extent the ALJ perceived a need for an additional or updated medical opinion, he took no steps to secure such opinion from any medical expert. The medical record before the ALJ provides no basis for rejecting the limitations noted by Claimant's treating physician.

The Commissioner in this case carried her Step 5 burden through testimony of a VE who identified jobs based upon the RFC assessed by the ALJ. R. 123-24. The VE, however, also testified that "most employers" would not allow "two additional 15-minute breaks in the eight-hour day on top of the normal breaks and lunch that are provided." R. 125. In addition, the VE from the first hearing before the ALJ testified that no job would be available for an individual who would consistently have more than two absences from work per month. R. 148-49. Had the ALJ properly considered the medical opinions of Dr. Vosburg there is a realistic possibility that he would have included additional limitations in his RFC assessment. The opinions of Dr. Vosburg support limitations greater than the RFC assessment. A change in the limitations within the questioning to the VE would cast doubt upon the existence of substantial evidence to support the ALJ's decision because to constitute substantial evidence to support a Step 5 finding of non-disability, testimony from a VE must include all limitations warranted by the evidence. *See Masterson v. Barnhart*, 309 F.3d 267, 273 (5th Cir. 2002); *Boyd v. Apfel*, 239 F.3d 698, 706 (5th Cir. 2001). Accordingly, to rely on the VE testimony to satisfy the Step 5 burden, the ALJ's hypothetical questioning would need to include all limitations warranted by the evidence.

The Court finds that the ALJ improperly considered and weighed opinions of Dr. Vosburg. There is no good cause to discount the weight of those opinions relative to any other expert. The ALJ failed to perform the detailed analysis required by 20 C.F.R. § 416.927. Had he conducted that analysis and properly considered and weighed the opinions of the treating physician there a realistic possibility that he would have altered the hypothetical to the VE to include greater limitations than assessed in the current RFC. Had the ALJ accepted Dr. Vosburg's opinions about Claimant's expected absences from work, no full-time job would exist that he could perform according to the VE who first testified in this case. *See* R. 148-49. Alternatively, there is a realistic possibility that the ALJ would have utilized procedures in 20 C.F.R. § 416.920b(c) to secure additional evidence or to have Claimant undergo a consultative examination. The changes resulting from either alternative "would cast into doubt the existence of substantial evidence to support the ALJ's current decision." *Perry v. Colvin*, No. 3:13-CV-2252-P, 2015 WL 5458925, at *11 (N.D. Tex. Sept. 17, 2015). Consequently, the procedural error casts doubt on the existence of substantial evidence to support the decision to deny benefits. Therefore, Claimant's substantial rights have been affected by the consideration and weight accorded to the opinions of the treating physician by the ALJ. This procedural error is not harmless and warrants remand.

Relying on *DeJohnette v. Berryhill*, 681 F. App'x 320, 321 (5th Cir. 2017) (per curiam); *Foster v. Astrue*, 410 F. App'x 831 (5th Cir. 2011) (per curiam), and other non-controlling cases, the Commissioner also notes that Dr. Vosburg's August 2015 questionnaire consists of checked boxes without additional explanation, which are properly discounted. Resp. at 10. These cases do not alter the Court's analysis. First, the ALJ did not rely on the check-the-box format to discount the opinions. In addition, Dr. Vosburg did provide additional explanation and support in his April 2015

questionnaire. While checkbox opinions are properly criticized for varying reasons in varying contexts, the facts of each particular case impact the ultimate usefulness of such opinions. Given the facts here, the checkbox nature of the August 2015 opinions of Dr. Vosburg provides no basis to alter the Court's analysis.

For all of these reasons, the Court finds that the ALJ improperly considered opinions of Dr. Vosburg and that this prejudicial error requires remand for further consideration. In her briefing, Claimant stresses the "stale" nature of the opinions of the non-examining physicians relied upon by the ALJ. While the opinions were from 2012 and 2013 instead of 2015 (like Dr. Vosburg), Claimant has alleged an onset of disability of May 7, 2012, thus placing her condition in 2012 at issue. In addition, Dr. Vosburg opined that Claimant's symptoms and related limitations date back to December 1, 2009, which provides an overlap between his opinions and those of the non-examining physicians. While the non-examining physicians certainly lacked access to later medical records and opinions, including those of Dr. Vosburg, the alleged staleness of those earlier opinions is not a material factor in the Court's determination and analysis.

## B.  Other Issues

In light of the reversible error by the ALJ, there is no need to address the other errors alleged by Claimant. She may "raise them before the ALJ on remand." *Thomas v. Berryhill*, No. 3:16-CV-3453-BT, 2018 WL 1517861, at *5 n.2(N.D. Tex. Mar. 26, 2018) (citing 20 C.F.R. § 404.983). Section 404.983 states in full:

> When a Federal court remands a case to the Commissioner for further consideration, the Appeals Council, acting on behalf of the Commissioner, may make a decision, or it may remand the case to an administrative law judge with instructions to take action and issue a decision or return the case to the Appeals Council with a recommended decision. If the case is remanded by the Appeals Council, the procedures

explained in § 404.977 will be followed. Any issues relating to your claim may be considered by the administrative law judge whether or not they were raised in the administrative proceedings leading to the final decision in your case.

Nevertheless, the Court may provide appropriate direction on remand. Claimant argues that the ALJ erred with respect to considering her borderline age category. The argument stems from using a Claimant's age as a vocational factor under 20 C.F.R. § 416.963. Subparagraph (b) provides in full:

> (b) How we apply the age categories. When we make a finding about your ability to do other work under § 416.920(f)(1), we will use the age categories in paragraphs (c) through (e) of this section. We will use each of the age categories that applies to you during the period for which we must determine if you are disabled. We will not apply the age categories mechanically in a borderline situation. If you are within a few days to a few months of reaching an older age category, and using the older age category would result in a determination or decision that you are disabled, we will consider whether to use the older age category after evaluating the overall impact of all the factors of your case.

"There is a split of authority, both between the Circuit Courts of Appeals and within the Fifth Circuit, regarding whether and to what extent the ALJ's decision must explicitly acknowledge and explain a borderline age situation decision." *Ware v. Colvin*, No. 3:12-CV-0291-RFC, 2014 WL 4999276, at *7 (W.D. Tex. Oct. 7, 2014); *accord Manning v. Colvin*, No. 3:13-CV-2178-D, 2014 WL 266417, at *6 (N.D. Tex. Jan.24, 2014).

According to Claimant, she "was 54 years, 7 months, and 19 days old at the date of the ALJ's decision." Pl.'s Mem. at 17. She contends that she is within the borderline category of a person closely approaching advanced age (age 50 to 54) and a person of advanced age (age 55 and older) and would have been determined to be disabled had she been considered under the older age category. *See id.* 15-18. The regulation mandates that the Commissioner "use each of the age categories that applies" during the alleged period of disability. 20 C.F.R. § 416.963(b). It also mandates that

the Commissioner "not apply the age categories mechanically in a borderline situation" and "consider whether to use the older age category" in certain circumstances. *Id.* On remand, the Commissioner must comply with this regulation.

In addition, although this Court declines to definitively decide the issue at this juncture, the *Manning* decision appears to provide well-reasoned guidance as to whether an ALJ's written decision must explain the consideration given to the borderline age issue. *See* 2014 WL 266417, at *7. The circumstances of this case appear to warrant some explanation in the written decision of the ALJ. Given the relevant disability period for Claimant's pending SSI claim – application date (July 2012) through the date of the ALJ's February 2017 decision – and the remand of this case for another decision, § 416.963(b) dictates that the Commissioner use both age categories in the next decision regarding Claimant's claim for SSI benefits.

## V. CONCLUSION

For the foregoing reasons and pursuant to the fourth sentence of 42 U.S.C. § 405(g), the Court **AFFIRMS** the decision of the Commissioner dismissing and thus denying Plaintiff's application for Disability Insurance Benefits under Title II of the Social Security Act; **REVERSES** the decision of the Commissioner to deny Plaintiff's application for Supplemental Security Income under Title XVI of the Act; and **REMANDS** this case for further administrative proceedings consistent with this order.

**SO ORDERED this** *15th* **day of March, 2019.**

E. SCOTT FROST
**UNITED STATES MAGISTRATE JUDGE**